405 F.2d 309
 In the Matter of AMPHITHEATRE, INCORPORATED, Bankrupt.
Maxwell A. STURTZ, Trustee in Bankruptcy Amphitheatre, Incorporated,
Trustee-Appellant, NEW YORK WORLD'S FAIR 1964-1965
CORPORATION, Petitioner-Appellee.
 No. 113, Docket 32354.
 United States Court of Appeals Second Circuit.
 Argued Oct. 16, 1968.
Decided Dec. 26, 1968.
 
 Alexander Henkin, New York City (Samuel P. Adelman and Robert P. Herzog, New York City), for trustee-appellant.
 Ambrose Doskow, New York City (Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City), for petitioner-appellee.
 Before WATERMAN and MOORE, Circuit Judges, and BONSAL,* District judge.
 MOORE, Circuit Judge:
 
 
 1
 The Trustee in Bankruptcy of Amphitheatre, Incorporated (Amphitheatre), appeals from an order of the District Court for the Eastern District of New York, reversing the Referee's decision to uphold a counterclaim by the Trustee for return of $250,000 in security against the New York Worlds' Fair Corporation (the Fair). The Fair sought to recover possession of its building and damages. The District Court remanded the case to the Referee to determine the amount the Fair is entitled to by resort to the security, and the Trustee appeals.
 
 
 2
 An agreement between Amphitheatre and the Fair resulted from extensive negotiations between the parties in February and March, 1961, for the lease of the 1939-1940 World's Fair New York State Amphitheatre and Exhibition Building in order for Amphitheatre to present commercial entertainment during the 1964-1965 World's Fair, then in preparation. The formal contract was signed on May 5, 1961. The term was to run from January a, 1962, through the Fair's closing date in 1965.
 
 
 3
 Pursuant to a clause in the lease contract, Amphitheatre subsequently signed a subscription agreement for Fair Corporation Notes on June 21, 1961, totalling $250,000. Payment was made by two checks dated July 24, 1961, and August 18, 1961. These Notes were retained by the Fair as security according to the terms of the lease agreement, but were to be returned to Amphitheatre at the expiration of the lease. The Notes themselves were not due until nine months later.
 
 
 4
 The Trustee contends that the clause in the lease contract providing for the purchase and retention of the Fair Notes violates Section 233 of the New York Real Property Law[1] (now General Obligations Law, McKinney's Consol.Laws, c. 24-A, 7-103). The Referee, after a hearing, found that it did violate that section and held that the Fair had converted the $250,000 received from Amphitheatre in exchange for the Fair's promissory Notes, entitling the Trustee to the funds without any offset.
 
 
 5
 The District Court reversed the Referee's determination on the ground that the transaction was a legitimate loan arrangement between the parties and not within the purview of the statute. We affirm that decision for the reasons set out below.
 
 
 6
 The pertinent clause of the lease is Paragraph Forth-first, which provides:
 
 
 7
 Within Sixty days after the execution of this lease * * * (Amphitheatre) shall deposit with the Fair * * * $250,000 principal amount of Fair Corporation's 6% Promissory Notes, purchased from the Fair * * * as security for the full performance of this lease * * *. After the end of the Term and upon condition that (Amphitheatre) shall then be nowise in default * * * and shall have restored the Premises as required herein, and upon written request therefor by (Amphitheatre), the Fair * * * will return the security to (Amphitheatre), less any breach or default by (Amphitheatre) under this lease.
 
 
 8
 This provision evolved, as disclosed in the hearings before the Referee, from the Fair's initial demand that Amphitheatre furnish a $750,000 surety-company bond. This being too costly, Amphitheatre countered with an offer that one of its promoters would give his personal guarantee for the proper performance of the lease.
 
 
 9
 At this same time, the fair was diligently attempting to meet the $25,000,000 subscription requirement needed to launch the $40,000,000 Note Issue and essential for the creation of the Fair. As an alternative to either a surety-company bond or a personal guarantee, the parties agreed that Amphitheatre would purchase $250,000 worth of the Fair's forthcoming issue. These Notes would then be deposited with the Fair to serve as security for the lease.
 
 
 10
 It is apparent that Amphitheatre would not have bought Fair Notes as an isolated investment and its undertaking to do so and to put them up as security under the lease was a part and, as the District Court emphasized, a substantial part, of the price paid for the lease. It is also equally clear, as noted, that the Fair was anxious to accumulate subscriptions amounting to $250,000,000 and Amphitheatre's purchase of 1% Was of material assistance in reaching that goal. Furthermore, getting those with a primary interest in the Fair, such as lessees and exhibitors, to show sufficient confidence in it by purchasing Fair Notes was a good inducement for others to invest.
 
 
 11
 Paragraph Forty-first, therefore, correctly represents the agreement to which the negotiations had led. It cannot be said to be an attempt to evade the statute, nor is it a sham. In short, the Fair, seeking to issue the Notes, needed capital commitments to meet the Launching requirements. Amphitheatre, desiring to produce entertainment during the Fair, found that by subscribing to Fair Notes, it could lease the Exhibition Building for that purpose.
 
 
 12
 The Trustee, however, asserts that the deposit of Notes was a deposit of money as security within the meaning of Section 233. While the deposit of the Notes was made as security for the performance of the lease, the nature of the transaction does not thereby become transformed into one for the deposit of money as security. The deposit of Fair Notes is not like cash that can be commingled with the Fair's other assets. Moreover, as is apparent from the Subscription Agreement, the money paid for the Notes was explicitly for, and limited to, preopening and construction expenses. That their purchase was a loan and not a deposit of money is additionally indicated by the fact that the Notes were not payable until nine months after the lease had expired and, although the Fair retained the Notes, interest was paid directly to Amphitheatre. The Notes and their deposit were an alternative to posting $750,000 in security, demanded in the early stages of negotiation. While this Court is not bound by labels or forms which the parties affix to their transaction, the Notes bore none of the characteristics present in the ordinary lease security situation regulated by Section 233.
 
 
 13
 The conclusion that Section 233 of the Real Property Law does not 'bar, nor undertake to bring within its operative reach, other relationships,' such as debtor-creditor arrangements between a landlord and his tenant is amply supported by New York cases.
 
 
 14
 In 800 Union Street Corp. v. Bookben Realty Corp., 302 N.Y. 926, 100 N.E.2d 188 (1951), a provision in a lease authorizing a landlord to use the security money to pay down the mortgage on the leased premises was deemed not to be within the purview of Section 233 even though there was no provision for repayment. The Court, however, implied a duty to repay the loan into a statutory segregated trust within a reasonable time which was to be held as security for the conclusion of the tenant's proper performance of the lease obligations.
 
 
 15
 Similarly in Barrow Associates v. South Broad Realty Corp., 275 App.Div. 914, 90 N.Y.S.2d 499 (1949), and in Land v. Gladol Realty Corp., 18 Misc.2d 103, 187 N.Y.S.2d 216 (Sup.Ct.1959), money paid to the landlord, authorized by the lease to be employed to acquire title in the premises, was held to be outside the sweep of Section 233.
 
 
 16
 The most recent case, Ja-Mo Associates, Inc. v. 56 Fulton Street Garage Corp., 30 A.D.2d 287, 291 N.Y.S.2d 62 (1968), went further. Money was loaned to the landlord to pay off various debts and obligations in order to enable it to acquire title to the premises and to be in a position to enter into the proposed lease. The loan was secured by a mortgage which was then assigned to the landlord pursuant to a rider to the lease '* * * as security for the performance of this lease.' The Court held section 7-103 of the General Obligations Law inapplicable to the transaction because the unambiguous terms of the written instruments made it absolutely clear that the loan was actually part of the consideration for the lease and that the sum was not deposited as security.
 
 
 17
 The above cases indicate that bona fide loan arrangements between landlords and tenants, at least which relate to the leased premises, do not violate Section 233 when the money is used to acquire title to or benefit the leased premises. The money paid by Amphitheatre for the Notes was to be used to cover part of the expense of rehabilitating the Amphitheatre premises, as well as to erect the Fair. The Note issue was, therefore, indispensable to Amphitheatre's entertainment project and crucial to the opening of the Fair. There could never have been any intention that the Fair would hold the money paid for the Notes as security. Section 233 is thus inapplicable.
 
 
 18
 The order of the District Court is affirmed.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 New York Real Property Law 233
 Whenever money shall be deposited * * * on a contract * * * for the use or rental of real property as security for performance of the contract * * * such money, with interest accruing thereon, if any, until repaid or so applied, shall continue to be the money of the person making such deposit * * * and shall be held in trust by the person with whom such deposit * * * shall be made and shall not be mingled with the personal moneys or become an asset of the person receiving the same, * * *. Any provision of such a contract * * * whereby a person who so deposits * * * money waives any provision of this section is absolutely void.